IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Edward Charles Cain, )<br>                Plaintiff, )<br>    vs. )<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>             Defendant. ) | Civil Action No. 6:15-4964-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

        This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

        The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed an application for disability insurance benefits ("DIB") on October 17, 2011, alleging that he became unable to work on July 20, 2008.  The application was denied initially and on reconsideration by the Social Security Administration. On August 29, 2012, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and Roy Sumpter, an impartial vocational expert, appeared at a hearing on March 4, 2014, considered the case *de novo* and, on August 5, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social

Security when the Appeals Council denied the plaintiff's request for review on November 2, 2015 (Tr. 1-3). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1) The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

(2) The claimant did not engage in substantial gainful activity during the period from his amended onset date of July 20, 2008, through his date last insured of December 31, 2012 (20 C.F.R. § 404.1571 *et seq*).

(3) Through the date last insured, the claimant had the following severe impairments: right and left knee pain, right hip pain, right and left shoulder pain, diabetes, and obesity (20 C.F.R. § 404.1520(c)).

(4) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5) After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with some limitations. The claimant is able to lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently; stand and walk for 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday. Further, the claimant can occasionally climb ramps and stairs, and should never climb ladders, ropes, or scaffolds. The claimant can occasionally kneel, crouch, and crawl; and occasionally climb, balance, and stoop. In addition, the claimant can occasionally reach overhead. Further, the claimant should avoid concentrated exposure to extreme temperature, humidity, wetness, and vibrations. In addition, the claimant should avoid all exposure to hazard machinery and dangerous equipment.

(6) Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

2

(7)  The claimant was born on May 21, 1973, and was 39 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

(8)  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and (20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in substantial numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant was not under a disability, as defined in the Social Security Act, at any time from July 20, 2008, the alleged onset date, through December 31, 2012, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

4

substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 35 years old on his alleged disability onset date (July 20, 2008) and was 39 years old on his date last insured (December 31, 2012) (Tr. 113).  He has a college education (Bachelor of Arts degree) and past relevant work experience as a vault painter, forklift operator, and polisher (Tr. 37, 65-66).

In July 2008, the plaintiff sought treatment from Franklin Sease, M.D., at Steadman Hawkins Clinic for right knee pain after tripping over an air hose at work (Tr. 232).  An x-ray of his right knee showed no signs of fracture, significant joint space loss, or significant degenerative changes, and a well-aligned joint (Tr. 232).  Examination of his right knee showed that the plaintiff had some soft tissue swelling, tenderness, reduced flexion and extension on range of motion testing, and an antalgic gait (favoring his right knee) (Tr. 232).  Dr. Sease assessed the plaintiff with a lateral meniscus tear of the right knee and sent him for an MRI (Tr. 232).  The plaintiff's MRI showed a small free edge tear of the

5

lateral meniscus, bending of the cartilage on the medial tibial femoral joint, intermediate severity chondromalacia, and moderate joint effusion, but intact anterior cruciate ligament ("ACL") and posterior cruciate ligament ("PCL") and no evidence of major meniscal tear and flap, which was Dr. Sease's major concern (Tr. 228, 273).  Dr. Sease recommended a course of physical therapy, which the plaintiff underwent (Tr. 228).

In August and September 2008, the plaintiff continued having some pain in his right knee, but he had made "a lot of progress" and was "doing much better" (Tr. 222-27).  His swelling and strength improved, and he felt more confident on his knee (Tr. 224).  At the end of September, Dr. Sease documented that the plaintiff had "excellent" range of motion in his right knee and no tenderness in his patella and medial and lateral joint lines (Tr. 222).  Dr. Sease found that the plaintiff was restricted on climbing, squatting, and bending, but not prolonged walking or standing, and could perform light duty work (Tr. 224, 226).  Because of these restrictions, Dr. Sease assessed that the plaintiff would unlikely be able to return to his past work duties, which required him to mount and operate a forklift and move heavy equipment (Tr. 224).

In October 2008, when "running across the yard," the plaintiff stepped awkwardly and fell to the ground.  Upon examination by Dr. Sease, the plaintiff had an antalgic gait and tenderness in both feet.  Anterior drawer, talar tilt, and reverse talar tilt were stable.  X-rays of his feet/ankles showed degenerative changes with no evidence of acute injury.  Dr. Sease diagnosed sprain/strain of his ankles (Tr. 220-21).

Later in October 2008, the plaintiff felt his right knee "pop" while climbing onto a forklift at work (Tr. 218).  The plaintiff had tenderness to palpation (primarily at patellar tendon); no significant swelling; positive McMurry's test (for damage/tear to meniscus); intact neurovascular functioning; full range of motion; and negative Valgus, patellar apprehension, and Lachman's tests (Tr. 216, 218).  Keith Lonergan, M.D., (Dr. Sease's colleague) diagnosed the plaintiff with right knee lateral meniscal tear along with

chondromalacia. He underwent arthroscopic surgery on his knee on November 6, 2008 (Tr. 215, 217, 274).

In November and December 2008, at one-week and one-month post-operative appointments, the plaintiff had minimal pain and began to regain his range of motion and strength (Tr. 211, 213). He had trace effusion, no appreciable swelling, near full range of motion, and intact stability (Tr. 211). Dr. Lonergan recommended that the plaintiff continue strengthening and stretching exercises (Tr. 211).

At follow-ups in January and March 2009, Dr. Lonergan found that although the plaintiff reported tenderness over the lateral retinaculum of his right knee, he had full extension and near full flexion (to 115/120 degrees), no effusion, adequate patellar mobility, intact stability, and intact neurovascular functioning (Tr. 207, 209). The plaintiff indicated that he had been walking on a treadmill for about 10-15 minutes (Tr. 207). In light of the plaintiff's continued reports of discomfort in his right knee, Dr. Lonergan gave him an injection and a prescription for Celebrex (Tr. 209-10).

In April 2009, the plaintiff, who was obese, returned to Dr. Lonergan to discuss weight loss options, which would help with his right knee pain (Tr. 205). The plaintiff had trace effusion, valgus deformity, and tenderness over the anterolateral joint line, but good patellar motion, good quad tone, near full range of motion from 0-115 degrees, and full (five out of five) strength (Tr. 205). Dr. Lonergan ordered a bone scan, which showed no evidence of subchondral edema (Tr. 202, 205). Weight loss programs and potential consultation with bariatric surgeon were discussed to decrease the force placed across the plaintiff's knee (Tr. 201). Dr. Lonergan also gave the plaintiff a steroid injection (Tr. 202).

In May 2009, the plaintiff saw George Bruce, M.D., an orthopaedist, for an independent medical examination (in connection with his workers' compensation claim) (Tr. 291-98). The plaintiff denied any difficulty with his upper extremities, and, therefore, they were not included in the examination (Tr. 293). The plaintiff walked with a limp of his right

7

lower extremity without the use of an assistive device (Tr. 292-93). He had full hip function with full range of motion and full (five out of five) strength (Tr. 293). Examination of his knees showed that he could fully flex his left knee and flex his right knee to 100 degrees; he had no significant effusion; he had no significant atrophy (with 1 cm of atrophy in right calf); he had reduced strength (four out of five) in the right knee; he had negative Lachman's test; and he exhibited no abnormal laxity (Tr. 293). He had normal dorsiflexion and plantar flexion in both ankles/feet (Tr. 297). Dr. Bruce determined that the plaintiff had a 42% impairment of his right lower extremity and felt that the plaintiff could not perform a job requiring him to be on his feet for a long period of time (Tr. 294-95).

On August 17, 2009, C. David Tollison, Ph.D., performed an independent medical evaluation for the plaintiff's workers' compensation case (Tr. 278-90). The plaintiff walked with a moderately antalgic gait without a cane (Tr. 280). The plaintiff related anxiety and depression symptoms, which he attributed to his pain/physical condition, and a decreased interest in social activities/being around others (Tr. 279-80). He had not obtained any psychological/psychiatric treatment for his alleged mental health symptoms (Tr. 279). Dr. Tollison found that the plaintiff was alert and oriented; he was polite and cooperative; he displayed satisfactory eye contact; his affect was blunted and mood was dysphoric/depressed; his thought processes were intact and coherent; his memory was grossly intact; and his intelligence was in the average range (Tr. 280). Psychological questionnaires administered indicated moderate range of depression (Tr. 280-81). Dr. Tollison assessed adjustment disorder with anxiety and depression and somatoform disorder, and gave a Global Assessment of Functioning ("GAF") score of 60[1] (Tr. 281). Dr.

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social,

Tollison also opined that plaintiff had moderate limitations in activities of daily living, social functioning, and concentration/persistence/pace. (Tr. 282).

In July 2010, Dr. Bruce performed another independent medical examination. The plaintiff denied any upper extremity problems. He appeared using crutches, and Dr. Bruce noted that he was unable to ambulate without the aid crutches or a table on which to balance himself. The plaintiff weighed 312 pounds. Dr. Bruce noted greater reduced range of motion in knees (60 degrees right and 50 degrees left), as compared to his prior examination, and reduced strength in left knee. Dr. Bruce assessed a 42% impairment of the right lower extremity and 56% impairment of the left lower extremity. Dr. Bruce assessed significant depression, which would equal a 29% physical impairment to the whole person without additional treatment, but noted that treatment of the plaintiff's depression could lessen the impairment rating (Tr. 295-98).

On September 29, 2010, Dr. Lonergan examined the plaintiff in connection with his workers' compensation claim. The plaintiff reported severe pain "now [in] both knees." He reported diffuse tenderness to palpation and had significantly limited range of motion secondary to pain (0-35/40 degrees then complained to pain) (Tr. 199). X-rays showed minimal arthritic changes (Tr. 200). Dr. Lonergan assessed knee osteoarthritis and recommended weight loss, aquatic therapy, neoprene compression sleeves, and anti-inflammatory medications (Tr. 200).

From this date to December 2011, the plaintiff did not receive any treatment and used Aleve for pain (Tr. 236).

---

occupational, or school functioning. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

On December 6, 2011, Larry Korn, D.O., performed a consultative examination (Tr. 237-40).  The plaintiff related pain in his knees, ankles, hips, and shoulders (Tr. 237-38).  His gait was abnormal, and he appeared with a cane, which he stated, "he trie[d] not to use it too much, so he d[id] not get in the habit of it" (Tr. 237).  "[H]e guard[ed] quite a bit with any passive motion, so it [was] a little bit difficult to assess" his upper extremity range of motion as well as in hips (Tr. 239).  Similarly, his knee range of motion was also difficult to assess:  74 degrees of flexion on left and 55 degrees on right, "but once again his guarding was substantial" and limited the quality of the assessment (Tr. 239).  He had no knee effusion or warmth; he had good valgus and varus stability bilaterally (Tr. 239).  He could squat about 30 degrees of flexion before he stopped (Tr. 240).  He had reasonably normal range of motion in his ankles and no pitting edema in his legs (Tr. 239).  He had pes planus (flat feet) and calluses on the soles of the feet (Tr. 239).  Examination of his hands and wrists was unremarkable (Tr. 239).  Dr. Korn concluded that his examination was "markedly limited in quality" because of guarding and subjective discomfort.  Accordingly, he recommended x-rays to further study the plaintiff's limitations (Tr. 240).  Dr. Korn noted that the "one area where [the plaintiff] has some rather obvious objective changes is with the acquired pes planus," which Dr. Korn felt was producing a lot of the plaintiff's ankle and hindfoot discomfort.  Dr. Korn opined that this – along with the plaintiff's obesity – would probably make it difficult for him to sustain weight bearing for extended periods and would make it difficult for him to cover anything other than level surfaces on his feet (Tr. 240).  Dr. Korn documented that the plaintiff displayed a normal mood; he communicated well; and he had good cognitive functioning (Tr. 238).

In February 2012, x-rays of the plaintiff's right knee showed no effusion and mild arthritic changes in the medial compartment; x-rays of his hip showed very mild arthritic changes in the superolateral joint (Tr. 243-44).

In March 2012, Hugh Clarke, M.D., a state agency physician, reviewed the evidence of record and found that the plaintiff was capable of performing light work that involved lifting 20 pounds occasionally and ten pounds frequently; sitting for six hours in an eight-hour workday; standing/walking for six hours in an eight-hour workday; occasionally climbing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to workplace hazards (Tr. 79-82). In making his assessment, Dr. Clarke "strongly considered" the plaintiff's symptoms but found that the medical evidence did not support the degree of alleged limitations (Tr. 82).

Beginning on May 9, 2012, the plaintiff started receiving medical care and treatment from Palmetto Proactive Healthcare. His primary treating physician was Christopher McCarthy, M.D. Dr. McCarthy treated the plaintiff for chronic pain related to his musculoskeletal complaints, as well as diabetes and major depression. The plaintiff appeared for routine appointments about every two to three months (Tr. 299-320). Dr. McCarthy documented a normal gait, and he prescribed anti-inflammatory medication and narcotic pain relievers for breakthrough pain, and recommended weight reduction for the plaintiff's osteoarthrosis and associated pain (Tr. 299-300, 302, 305, 307, 309, 311, 313). During appointments, the plaintiff reported feeling well overall and doing some exercising, such as going to the gym with his daughter (Tr. 313).

On July 10, 2012, x-rays of his right and left shoulders showed glenohumeral joint arthropathy (Tr. 257).

On July 12, 2012, Dr. Korn performed another consultative examination (Tr. 260-62). The plaintiff was 5'9" tall and weighed 370 pounds (Tr. 260). He had near symmetrical range of motion of his shoulders, no significant atrophy, and reasonably intact strength (Tr. 261). His wrists were normal and had some conditioning/callusing of his hands; otherwise, his hands were unremarkable with full (five out of five) strength (Tr. 261). The plaintiff appeared using a single cane held in his right hand (Tr. 261). Dr. Korn noted

11

that it was "a little difficult to assess [his lower extremities] because there appear[ed] to be some inconsistency" (Tr. 261). He would only flex his left knee to 50 degrees and right knee to 80 degrees; he had good valgus and varus integrity; and he had a negative Lachman's test bilaterally (Tr. 261). He had reasonable range of motion of his hips (Tr. 261). He had some acquired pes planus, only a few degrees of limitation of dorsiflexion in his ankles, and normal plantar flexion (Tr. 261). He walked with an abnormal gait (Tr. 261). There was no notable atrophy, no weakness, and no sensory loss in his lower extremities (Tr. 261). Dr. Korn assessed that the plaintiff would not be able to crouch, squat, or bend at the knees; would not be able to perform overhead manipulations; and would have difficulty climbing as well as ambulating rough or uneven terrain. Dr. Korn specifically found that the plaintiff had severe morbid obesity, cognitive limitations, mild degenerative joint disease in the right knee, possible degenerative joint disease in the ankles, and significant shoulder motion limitation (Tr. 262). Dr. Korn found that the plaintiff's mood and behavior were normal (Tr. 260). He spelled "world" and "fish" forwards, but not backwards; he spelled "dog" forwards and backwards; he could not perform serial 3's and "really ma[de] a poor attempt of doing serial 2[']s"; and he could count down from 100 by 1's (Tr. 260).

In August 2012, James Stallworth, M.D., a state agency physician, reviewed the updated record and concluded that the plaintiff could perform light work that involved occasionally climbing stairs/ramps, stooping, kneeling, crouching, and crawling; no climbing ladders/ropes/scaffolds; limited overhead reaching with bilateral upper extremities; no concentrated exposure to temperature extremes, wetness, humidity, and vibration; and no exposure to environmental hazards (Tr. 94-97). Dr. Stallworth also considered the plaintiff's subjective complaints, finding that his alleged functional limitations were partially credible in light of the medical evidence (Tr. 94).

In November 2012, the plaintiff told his primary care physician, Dr. McCarthy, that he was having mood problems, namely crying and irritability (Tr. 305). Dr. McCarthy

12

documented normal speech, eye contact, and affect (Tr. 305). Dr. McCarthy prescribed an antidepressant (Tr. 306). At a follow-up the next month, the plaintiff related an improved mood on medication (Tr. 307).

From January 21-26, 2013, just after the relevant period, the plaintiff was treated at the Village Hospital for hyperglycemia secondary to uncontrolled diabetes, hyponatremia, dehydration, acute renal insufficiency, and uncontrolled hypertension (Tr. 264-70). Once his blood sugars were stabilized with insulin, he reported feeling fine (Tr. 265). During hospitalization, he ambulated unassisted without any difficulty and fully moved all extremities (Tr. 269). He was prescribed medication and counseled on diabetic education, diet, lifestyle modification, and weight reduction (Tr. 270).

From August 2013 to October 2013, the plaintiff received therapy at Kathy Murphy Counseling. John Height, M.A., the plaintiff's counselor, stated that the plaintiff's feelings of worthlessness and hopelessness came most immediately from his inability to provide for his family and issues associated with his weight gain. Mr. Height documented that the plaintiff made great improvement in therapy and felt much better about himself (Tr. 369).

On January 6, 2014, W. Wallace Fridy Jr., M.D., of Woodward Medical Center, examined the plaintiff at the request of his attorney (Tr. 321-26). The plaintiff, who appeared in no acute distress, could not extend his arms above his head, could not walk up any steps, could not squat, and could stand for only a few moments at a time (Tr. 322). He weighed 364 pounds (Tr. 322). Dr. Fridy determined that the plaintiff was unable to lift any type of object greater than 11-20 pounds for longer than five to ten minutes. Dr. Fridy opined that the plaintiff was unable to stand on his feet, walk more than 40-60 yards, walk up stairs, or crawl, squat, bend, climb, and reach (Tr. 323). Dr. Fridy further indicated that the plaintiff was unable to perform any form of gainful employment due to his physical

inabilities (Tr. 323).  An overall view of Dr. Fridy's Physical Capacities Evaluation indicated that the plaintiff's capabilities are less than sedentary (Tr. 326).

The plaintiff testified at the administrative hearing that, although his work injury and resulting surgery was to his right knee, his left knee also began hurting after the accident (Tr. 39).  After he was injured, he gained between 120 and 140 pounds (Tr. 40). In 2011, he thought he weighed about 325 pounds.  At the time of the hearing, he weighed 383 pounds (Tr. 40).  He testified that his obesity causes him to have problems with his movement and contributed to his depression (Tr. 59-60).

The plaintiff testified that his knees "give out on (him)" and constantly hurt when he moves (Tr. 48).  His knees even hurt with a sharp pain when he is not moving. The plaintiff estimated that he could stand about two to three minutes without his cane (Tr. 48-50).  He estimated he could walk about ten steps.  He used a cane every day to help him walk.  He did not attempt to walk without his cane due to his knee pain (Tr. 49).  He estimated he could sit for about 20 minutes before his legs go to sleep (Tr. 51).

The plaintiff testified that, during the time he was out of work, he became depressed with feelings of worthlessness.  He would yell at his wife and child and sit alone in a darkened room by himself.  He also developed pain and complications in his shoulders, lower back, ankles and right hip.  In particular, he had difficulties lifting his arms above his head (Tr. 41-42).  He could lift three to five pounds.  The plaintiff had also developed problems with his ankles with his right ankle being worse than his left.  His ankles stayed swollen and painful (Tr. 46).  He had sharp aching pains in his shoulders while at rest (Tr. 43-44).  The plaintiff has been prescribed Tramadol and Lortab 10 for his pain (Tr. 45)

He was diagnosed with diabetes in January 2013 and injected himself with Victoza (Tr. 47-48).  His diabetes caused lightheadedness, tingling toes and fingers, and the feeling that he would pass out Tr. 58).

The plaintiff testified that he depended on his wife to prepare his breakfast for him. He spent a great deal of his time sleeping and did not go outside unless required (Tr. 52). He could drive five to ten minutes at a time. He did not do any household chores, have any hobbies, or work in the yard. The plaintiff testified that "in the course of a day, [he] really do[es]n't do anything" (Tr. 52-53).

At the hearing, the ALJ asked the vocational expert to consider an individual of the plaintiff's age, education, and work experience, who was able to perform a range of light work that involved lifting/carrying no more than ten pounds frequently and 20 pounds occasionally; sitting and standing/walking each for six hours in an eight-hour workday; only occasional overhead reaching with bilateral upper extremities; occasional climbing stairs/ramps, balancing, stooping, kneeling, crouching, and crawling; no climbing ladders/ropes/scaffolds; no concentrated exposure to temperature extremes, humidity, and wetness; and no exposure to workplace hazards (Tr. 14-15, 66). The vocational expert testified that the plaintiff could perform unskilled, light work that existed in significant numbers in the national economy such as the representative jobs of cashier II, storage facility clerk, and bench assembler (Tr. 66-67).

With regard to activities of daily living, the plaintiff told Dr. Tollison in August 2009 that he attended his daughter's school functions; drove a car when necessary; performed some light household chores (meal preparation, laundry, and cleaning); occasionally shopped in grocery stores for a few items; and occasionally watched television and played video games (Tr. 280). In June 2013, the plaintiff reported to Dr. McCarthy that he was going to the gym with his daughter, but he had to double up on his pain pills (Tr. 313).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find that he had an impairment or combination of impairments that met or medically equaled the severity of

Listing 1.02; (2) failing to properly consider treating and evaluating physicians' opinions; (3) mischaracterizing and misstating the record by equating his activities of daily living with an ability to work; and (4) failing to make a proper credibility finding (doc. 13 at 1).

***Listing 1.02 and Medical Opinions***

The plaintiff first argues that the ALJ erred in failing to find that his impairments meet or medically equal Listing 1.02. Within this argument, the plaintiff also argues that the ALJ erred in failing to properly consider the opinions of his treating and examining physicians, in relying on the opinions of the non-examining state agency physicians, and in failing to consider his impairments in combination (doc. 13 at 7-12).

Listing 1.02 requires the following:

*Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. The listings further define the inability to ambulate effectively as an extreme limitation of the ability to walk, i.e., "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id*. § 1.00B2b. The listings cite examples of ineffective ambulation as including:

the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on

16

> rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id*. Moreover, the inability to perform fine and gross movements effectively "means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id*. § 1.00B2c. "[E]xamples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level. *Id*.

The ALJ reasonably found that the plaintiff did not satisfy Listing 1.02A, because the record failed to establish involvement of a major weight-bearing joint resulting in an inability to ambulate effectively or, stated differently, an extreme limitation in the ability to walk (Tr. 14). Substantial evidence of record supports the ALJ's finding that, despite the plaintiff's lower extremity joint impairments, he did not have an extreme limitation in his ability to walk as defined by the regulation set forth above (Tr. 14-24). The plaintiff routinely appeared at medical appointments without using any hand-held assistive device(s); therefore, the record establishes that he could ambulate adequately without the use of a hand-held assistive device(s) (Tr. 200, 205, 207, 211, 213, 220-27, 269, 280, 292-93, 305, 307). Likewise, there was no medical documentation establishing that the plaintiff required the use a hand-held assistive device(s) (limiting the functioning of both upper extremities) and the circumstances for which it was needed. *See* SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time,

17

periodically, or only in certain situations; distance and terrain; and any other relevant information.").

The plaintiff refers to a notation in the record where he appeared at a worker's compensation evaluation using crutches (doc. 13 at 8). However, this isolated reference does not satisfy the severity necessary to meet or equal Listing 1.02, which requires the need for use of a hand-held assistive device(s) limiting functioning of both extremities to last (or be expected to last) at least 12 months. As noted by the Commissioner, while the plaintiff appeared at this single examination using the crutches for minimal ambulation, Dr. Bruce documented that the plaintiff had ambulated without crutches or any hand-held assistive device at his prior examination (Tr. 295-96). Moreover, the plaintiff ambulated at appointments independently before and after this examination (Tr. 200, 205, 207, 211, 213, 220-27, 269, 280, 292-93, 305, 307). The record also indicated that the plaintiff was able to perform routine ambulatory activities, such as attending his daughter's school functions, picking up a few items at the grocery stores, walking up and down stairs, and handling light household chores (Tr. 237, 280). Further, the record indicated that the plaintiff walked on a treadmill and exercised at a gym, which is incompatible with the severity required to meet the listing (Tr. 207, 313).

Also, at two consultative examinations by Dr. Korn, the plaintiff appeared using a single cane; however, he conceded to Dr. Korn that he did not use a cane much for walking "so he did not get into the habit of [using] it" (Tr. 237, 239, 260). Critically, the use of a single cane is not enough to meet the regulatory definition, which requires use of a hand-held assistive device(s) that limits the functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02B2b. Further as discussed above, the record was void of evidence establishing that the plaintiff's use of a hand-held assistive device was medically necessary, and the plaintiff was able to adequately ambulate without an aide, routinely appearing at appointments without one.

18

The record also establishes that the plaintiff cannot satisfy Listing 1.02B, as reasonably concluded by the ALJ (Tr. 14).  The plaintiff did not have involvement of a major peripheral joint in each upper extremity that resulted in the inability to perform fine and gross movements effectively, as defined by regulation.  The evidence showed that, other than callusing/conditioning, the plaintiff's hand examinations were unremarkable, and he had full (five out of five) motor strength (Tr. 239, 261).  In addition, the record indicates that the plaintiff engaged in activities requiring the ability to perform fine and gross manipulations, such as playing video games (Tr. 280).

The plaintiff further argues that the ALJ erred in failing to give greater weight to the opinions of Drs. Bruce, Korn, Tollison, and Fridy (doc. 13 at 8-10).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Here, no medical source of record, treating or examining, opined that the plaintiff satisfied the listing criteria. With regard to the opinions of Drs. Bruce, Korn, Tollison, and Fridy as to the limitations imposed by the plaintiff's impairments, the undersigned finds that the ALJ gave comprehensive explanations supported by substantial evidence in his findings as these opinions.

The ALJ reasonably afforded limited weight to the opinion of Dr. Bruce, who examined the plaintiff in connection with his worker's compensation claim on two occasions in May 2009 and July 2010 (Tr. 22-23). At the May 2009 evaluation, Dr. Bruce determined that the plaintiff had a 42% impairment of his right lower extremity and felt that the plaintiff could not perform a job requiring him to be on his feet for a long period of time (Tr. 294-95). At the July 2010 evaluation, he assessed a 42% impairment of the right lower extremity and 56% impairment of the left lower extremity. Dr. Bruce assessed significant depression, which would equal a 29% physical impairment to the whole person without additional treatment, but noted that treatment of the plaintiff's depression could lessen the impairment rating (Tr. 295-98).

As the ALJ explained, Dr. Bruce's opinion establishing percentage disability ratings for worker's compensation purposes did not set forth any functional limitations and, therefore, was of limited value in assessing the plaintiff's work capacity (Tr. 23). In addition,

the ALJ found that Dr. Bruce's opinion was inconsistent with the longitudinal treatment record, which he thoroughly discussed in his decision (Tr. 14-25).  For instance, the plaintiff's right knee impairment improved with treatment, and the plaintiff did not allege complaints related to his left lower extremity until July 2010 (two years after he claims that he became disabled) (Tr. 199, 296).  Following right knee arthroscopy, Dr. Lonergan documented that the plaintiff had good patellar motion, good quad tone, near full range of motion from 0-115/120 degrees, full (five out of five) strength, intact stability, and intact neurovascular functioning (Tr. 205, 207, 209).  The plaintiff stopped seeing Dr. Lonergan after his six-month post-operative appointment in April 2009 (aside from one worker's compensation related appointment in November 2010) and sought no further treatment from a treating source during the relevant period.  The remainder of the evidence from the relevant period consists of periodic evaluations for his worker's compensation claim and two consultative examinations.   These evaluations were often limited by the plaintiff's inconsistencies.  For example, at Dr. Bruce's initial examination, the plaintiff walked without the use of an assistive device; he could fully flex his left knee and flex his right knee to 100 degrees; he had no significant effusion; he had no significant atrophy; he had minimally reduced strength in the right knee; he had negative Lachman's test; and he displayed no abnormal laxity (Tr. 292-93).  Whereas, at his subsequent evaluation with Dr. Bruce (without any intervening occurrence/event), the plaintiff appeared using crutches and displayed much more limited abilities on examination (Tr. 296-97).  Similarly, Dr. Korn documented that it was difficult to assess [the plaintiff's lower extremities] because there appear[ed] to be some inconsistency" and noted possible symptom magnification with regard to his shoulder limitation (Tr. 261-62).  Further, as the ALJ noted, the plaintiff took primarily over-the-counter medication for pain, and the clinical evidence did not demonstrate work-preclusive functional limitations (Tr. 14-25).  For example, the plaintiff had no notable atrophy, no weakness, and no sensory loss in his lower extremities (Tr. 261).  Moreover,

the diagnostic evidence indicating minimal arthritic changes in the plaintiff's knees and the extent and nature of the plaintiff's treatment during the relevant period, as the ALJ discussed, supported the ALJ's decision to afford minimal weight to Dr. Bruce's opinion (Tr. 14-25; *see* Tr. 200, 243-44).

The ALJ also provided legally and factually sufficient reasons for finding that Dr. Korn's opinion was entitled to limited weight (Tr. 21-22). Dr. Korn performed two consultative examinations, one in December 2011 and the other in July 2012. In December 2011, Dr. Korn concluded that his examination was "markedly limited in quality" because of guarding and subjective discomfort; accordingly, he recommended x-rays to further study the plaintiff's limitations (Tr. 240). Dr. Korn noted that the "one area where [the plaintiff] has some rather obvious objective changes is with the acquired pes planus," which Dr. Korn felt was producing a lot of the plaintiff's ankle and hindfoot discomfort. Dr. Korn opined that this – along with the plaintiff's obesity – would probably make it difficult for him to sustain weight bearing for extended periods and would make it difficult for him to cover anything other than level surfaces on his feet (Tr. 240). In July 2012, Dr. Korn noted that it was "a little difficult to assess [his lower extremities] because there appear[ed] to be some inconsistency" and noted possible symptom magnification with regard to the plaintiff's shoulder motion limitation (Tr. 261-62). Dr. Korn assessed that the plaintiff would not be able to crouch, squat, or bend at the knees; would not be able to perform overhead manipulations; and would have difficulty climbing as well as ambulating rough or uneven terrain (Tr. 262).

As the ALJ noted in evaluating Dr. Korn's opinion, there was no longitudinal treatment relationship, weighing against affording his opinion significant weight (Tr. 21). Moreover, Dr. Korn's opinion findings were not well supported by clinical findings because, as Dr. Korn explained, his examinations findings were limited due to the plaintiff's level of effort, inconsistencies displayed on examination, and possible symptom magnification (Tr. 20; *see* Tr. 237-39, 261-62). Further, Dr. Korn's assessment was inconsistent with other

substantial evidence, as discussed above in connection with Dr. Bruce's opinion.  With regard to Dr. Korn's proffered upper extremity limitation, the record shows that the plaintiff did not allege upper extremity problems, in fact specifically denied them, until December 2011 (approximately three and a half years after he alleges disability) (Tr. 237, 293, 296). Moreover, the plaintiff had near symmetrical range of motion of his shoulders, no significant atrophy, and reasonably intact strength in his upper extremities (Tr. 261).  Accordingly, the ALJ appropriately did not assess reaching limitations greater than limiting the plaintiff to occasionally reaching overhead, as provided in the residual functional capacity ("RFC") (Tr. 14).

Substantial evidence also supports the ALJ decision to afford minimal weight to the opinion of Dr. Tollison concerning the plaintiff's mental limitations after examining the plaintiff on a single occasion in August 2009 (Tr. 20-21).  Dr. Tollison opined that the plaintiff had moderate limitations in activities of daily living, social functioning, and concentration/persistence/pace. (Tr. 282). As the ALJ discussed, Dr. Tollison's opinion was inconsistent with his minimal findings on mental status examination (Tr. 20-21). Specifically, although the plaintiff's mood was dysphoric/depressed, Dr. Tollison found that the plaintiff was alert and oriented; he was polite and cooperative; he displayed satisfactory eye contact; his thought processes were intact and coherent; his memory was grossly intact; and his intelligence was in the average range (Tr. 280).  Further, Dr. Tollison's opinion was inconsistent with substantial evidence of record showing minimal mental health complaints and treatment.  It was not until November 2012 (a month before the expiration of his insured status) that the plaintiff reported mood problem to his treating source, Dr. McCarthy, who documented normal speech, eye contact, and affect (Tr. 305).  The plaintiff related an improved mood on antidepressant medication (Tr. 307).  After the relevant period, the plaintiff received therapy, wherein he demonstrated improvement and felt much better about himself (Tr. 369).  Further, as the ALJ also noted, the plaintiff's activities of

23

daily living, including attending school functions, playing video games, driving, helping out around the house, and occasionally going to church, were inconsistent with the limitations opined to by Dr. Tollison  (Tr. 20-21).

The ALJ's finding that Dr. Fridy's opinion was entitled to limited weight was also supported by substantial evidence (Tr. 23).  Dr. Fridy determined that the plaintiff was unable to lift any type of object greater than 11-20 pounds for no longer than five to ten minutes.  Dr. Fridy opined that the plaintiff was unable to stand on his feet, walk more than 40-60 yards, walk up stairs, or crawl, squat, bend, climb, and reach (Tr. 323).  Dr. Fridy further indicated that the plaintiff was unable to perform any form of gainful employment due to his physical inabilities (Tr. 323).

As the ALJ discussed, Dr. Fridy's one-time evaluation of the plaintiff in January 2014, over a year after the relevant period, was of little probative value in assessing the plaintiff's functional limitations during the period at issue (Tr. 23-24).  As the ALJ found, Dr. Fridy's opinion was inconsistent with the examination findings from July 2012 and January 2013, the plaintiff's activities of daily living, treatment notes from Palmetto Proactive Healthcare, the plaintiff's treatment of pain primarily with over-the-counter medication, and lack of medication side effects  (Tr. 23).  The ALJ further found that the probative value of the evidence was reduced because the plaintiff was not a treating source, his examination was minimal, and he relied primarily on the plaintiff's own subjective statements concerning his abilities/limitations (Tr. 23-24). *See* 20 C.F.R. § 404.1527(c)(2)(iii) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (affirming ALJ's accordance of minimal weight to a medical opinion "based largely upon the claimant's self-reported symptoms").

24

The plaintiff further contends that the ALJ erred in giving great weight to the opinions of the state agency physicians (doc. 13 at 9-11). Drs. Clarke and Stallworth considered Listing 1.02, but found that the evidence did not establish that the plaintiff's impairments were severe enough to meet or medically equal the requirements of the listing (Tr. 79, 93). Further, as noted above, no medical source of record, treating or examining, opined that the plaintiff satisfied the listing criteria. The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

In the RFC assessment, the ALJ reasonably found that the Drs. Clarke and Stallworth's opinions were entitled to great weight because they were consistent with the evidence record (Tr. 24-25). The plaintiff claims that the state agency expert opinion evidence was unacceptable because it was rendered before all of the evidence was entered in the record (doc. 13 at at 9-10). However, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v.*

*Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).  Here, the ALJ considered the complete record in determining the weight to afford to the medical opinions (Tr. 14-25).  The ALJ acknowledged that greater postural limitations (only occasional overhead reaching with bilateral upper extremities) and greater environmental restrictions than those assessed by Dr. Clarke were necessary because of the additional evidence concerning his shoulder impairments following Dr. Clarke's record review (Tr. 24; *see* Tr. 257, 260-62).  Based upon the foregoing, the undersigned finds no error in the ALJ's consideration of the state agency physicians' opinions.

The plaintiff also argues in a conclusory fashion that the ALJ failed to consider the combined effects of all his impairments – physical, mental, and pain (doc. 13 at 11). *See* 20 C.F.R. § 404.1526(b)(3) ("If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.").  When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).  The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

26

The undersigned finds that the ALJ adequately considered the plaintiff's impairments in combination at all steps of the disability determination process. In particular, the ALJ stated:

> The undersigned specifically considered the effects of the claimant's impairments, both separately and in combination, and found that the record only supports functional limitations to a degree that is consistent with the above residual functional capacity. The undersigned has specifically tailored the residual functional capacity above to take into account all of the claimant's functional limitations for which there is support in the record.

(Tr. 16). The ALJ went on to discuss the medical evidence regarding the plaintiff's severe impairments - knee pain, hip pain, shoulder pain, diabetes, and obesity - as well as the plaintiff's depression, which the ALJ found was a nonsevere impairment (Tr. 12-25). In doing so, the ALJ stated:

> The effects of the claimant's obesity have been considered when determining a residual functional capacity for the claimant and these considerations have been taken into account in reaching the conclusions herein.
>
> All of the claimant's impairments have been considered in combination without regard to whether any impairment if considered separately would be vocationally relevant. The mere existence of a medical impairment does not determine disability. Instead, the relevant consideration is the effect of the impairment or combination of impairments, on the claimant's ability to perform substantial gainful work activities. . . .

(Tr. 19).

"The court is permitted to take the ALJ at his word." *Johnson v. Colvin*, C.A. No. 2:12-cv-1475-JMC, 2013 WL 5139122, at *11 (D.S.C. Sept. 11, 2013) (citing *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir.2007) (taking the ALJ at his word when he stated that he considered all of the claimant's impairments in combination)). The ALJ took into account the plaintiff's combination of impairments in making his determination that the plaintiff had the RFC to perform a limited range of light work (Tr. 14-15). The ALJ applied

27

the correct legal standard and made findings that were supported by substantial evidence in considering all of the plaintiff's impairments and their combined effects. Accordingly, this allegation of error is without merit.

Based upon the foregoing, the undersigned finds that the ALJ did not err in his listing analysis nor in his consideration of the medical opinions of record. Furthermore, substantial evidence supports his findings.

***Credibility***

The plaintiff next argues that the ALJ failed to properly evaluate his credibility (doc. 13 at 15-16). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original). In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006). However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or

28

sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White*

*v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 404.1529(c).

Here, the ALJ found that although the plaintiff had underlying impairments that could reasonably produce his symptoms, the evidence of record did not support the severity, persistence, and limiting effects of the plaintiff's subjective complaints to the extent he alleged (Tr. 15-25). Accordingly, the ALJ found that the plaintiff was only partially credible. In reaching this finding, the ALJ followed controlling agency regulations and policy by considering his longitudinal treatment record, the objective medical evidence, treatment

30

modalities and effectiveness, statements made by the plaintiff and physicians, and his activities of daily living (Tr. 15-25).

Contrary to the plaintiff's assertion (doc. 13 at 12-15), the ALJ did not equate the plaintiff's activities of daily living with his ability to work. While "[a]n individual does not have to be totally helpless or bedridden in order to be found disabled under the Social Security Act," *Totten v. Califano*, 624 F.2d 10, 11 (4th Cir.1980), the consideration of a claimant's daily activities is a proper consideration in assessing credibility, as set forth above. 20 C.F.R. § 404.1529(c)(3)(i);   SSR 96-7p, 1996 WL 374186, at *3. *see also, e.g., Davis v. Colvin*, C.A. No. 13-768, 2014 WL 4181025, at *7 (E.D. Va. Aug. 18, 2014) ("[S]ince the plaintiff's daily activities are not reflective of one with debilitating symptoms, the [ALJ] properly took the plaintiff's daily activities into consideration regarding her credibility."). The ALJ accurately summarized his daily activities and found that, coupled with the other credibility factors, they did not support his claim of debilitating limitations (Tr. 19-20). As the ALJ reasonably concluded, the plaintiff's inconsistencies with regard to his activities detracted from his credibility. For example, the plaintiff testified that, "in the course of a day, [he] really do[es]n't do anything." He sits, lies down, and sleeps (Tr. 52-53). However, the record indicated that the plaintiff's activities were not so limited. The plaintiff attended his daughter's school functions; drove a car; performed some light household chores (meal preparation, laundry, and cleaning); occasionally shopped in the grocery stores for a few items; watched television and played video games; and exercised some (e.g., went to gym with daughter, walked on the treadmill) (Tr. 207, 280, 313). The ALJ also noted (Tr. 20) that in Dr. Korn's evaluation of the plaintiff in December 2011, he stated that it was difficult to assess the plaintiff's shoulder, hip, and knee impairments due to guarding (Tr. 238-40) and at a later evaluation in July 2012, Dr. Korn stated that the plaintiff "really ma[de] a poor attempt of doing serial 2[']s"(Tr. 260).

31

The plaintiff argues that the ALJ erred in the "blatant use of the improper 'sit and squirm' test" (doc. 13 at 15).  The undersigned disagrees.  It is permissible for the ALJ to consider in the credibility analysis, as one factor out of many, his observations at the hearing. *Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted). *See also* SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations). Here, the ALJ noted that he observed plaintiff sit "throughout the hearing from 11:02 a.m. until 12 noon without apparent discomfort" while the plaintiff "reported sitting tolerance of 20 minutes" (Tr. 20).  As set forth above, the ALJ considered several factors in making the credibility determination, and, accordingly, he did not err in considering his own observations.

## CONCLUSION AND RECOMMENDATION

The plaintiff's arguments fail to show that the ALJ's decision was not based on substantial evidence and the application of correct legal principles. Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 6, 2016
Greenville, South Carolina